196 So. 62

**STATE v. HART et al.**

No. 35625.

April 1, 1940.

Rehearing Denied April 29, 1940.

Warren Doyle, of New Orleans, and John R. Hunter, of Alexandria, for relator.

Lessley P. Gardiner, Atty. Gen., James O'Connor, Asst. Atty. Gen., and Truett L. Scarborough, Dist. Atty., of Ruston, for the State.

O'NIELL, Chief Justice.

The relator in this case, and four other men, namely, Leon C. Weiss, F. Julius Dreyfous, Solis Seiferth, and Richard W. Leche, are charged in an indictment by the grand jury of Lincoln parish with the crime of obtaining fraudulently and feloniously, from the State of Louisiana, and the Louisiana State Board of Education, and Louisiana Polytechnic Institute, in Lincoln parish, the sum of $27,000, by means and use of a confidence game. The only question now tendered for decision is whether the venue is in Lincoln parish. The statute on the subject, Act No. 43 of 1912, makes it a crime for one to obtain or attempt to obtain from another any money or property by means or use of any false or bogus check, or by any other means, instrument or device, commonly called the confidence game.

The alleged fraudulent transactions, by which the defendants are accused of obtaining the $27,000, are set forth in detail in the indictment, as required by the statute. It is alleged that Weiss, Dreyfous and Seiferth are architects composing a firm that was employed by the State of Louisiana and the State Board of Education and Louisiana Polytechnic Institute to draw the plans and specifications for the construction of a building on the campus of Louisiana Polytechnic Institute, and to superintend the advertisement for bids and the awarding of the contract, and to draw up the contract in accordance with the plans and specifications, and to superintend the construction of the building, and to perform all duties usually and customarily

performed by architects so employed. It is alleged that the architects prepared the plans and specifications and superintended the advertising for and the awarding of the bids; that when the bids were received the bid of Caldwell Bros. & Hart, for $264,-482.13, was accepted, and the contract was awarded to them, subject to the money being available, which money was afterwards made available from lawful sources; that Weiss, Dreyfous and Seiferth, with the unlawful and felonious aid and assistance and advice of Monte E. Hart and Richard W. Leche, unlawfully and feloniously drew the contract for the building, and, in drawing it, raised the bid of $264,-482.13, which had been accepted by the State Board of Education, to $291,482.13, by adding $27,000 to the amount of the bid; that the architects then sent by messenger to the President of the State Board of Education for his signature the contract which had been unlawfully raised; that the defendants thus secured the acceptance of the unlawfully raised contract; that the president of the board relied upon and placed his faith and trust in the architects, and believed that they would protect the interests that they were paid to protect, and that he therefore signed the contract without having the records available to check the bids, and without knowing that the amount had been raised; that the building was constructed under the unlawfully raised contract by Caldwell Bros. & Hart, and that they were paid the sum of $291,482.13, by Louisiana Polytechnic Institute, from funds furnished by the State Treasury, and on architects' certificates signed by Weiss, Dreyfous and Seiferth; and that the architects' certificates were false, to the knowledge of all of the defendants, but not to the knowledge of the officers of Louisiana Polytechnic Institute who made the payments, and who also placed their faith and trust in the architects, to the extent of believing that they would not submit false architects' certificates and receive money not due them, or aid or assist the contractors in receiving money that was not due them. It is alleged that the payment of the $291,482.13 to the contractors, Caldwell Bros. & Hart, was made in seven payments, and on the seven dates stated in the indictment as the dates on which the crime is alleged to have been committed.

Before the defendants excepted to the jurisdiction of the court, the district attorney moved to amend the indictment by alleging that the defendants had formed a conspiracy to defraud the State of Louisiana, the State Board of Education and Louisiana Polytechnic Institute of the $27,-000, by the method described in the indictment, and that the fraudulent acts described in the indictment were committed by the defendants in furtherance of the conspiracy. The proposed amendment was objected to by the defendants, but the objection was overruled and the amendment was allowed. The objection, so far as it affected the question of venue or jurisdiction, was that the district attorney was resorting to Act No. 123 of 1936, which provides that, whenever a conspiracy to commit a crime is entered into in any parish in the state and an overt act in furtherance of the conspiracy is committed in another parish, the prosecution may be had in either

parish, "subject to the approval of the Attorney General whose decision shall be final" etc. It is argued that, so far as the statute purports to · allow the attorney general to authorize a prosecution to be had in a parish other than that in which the crime was committed, the statute is violative of the requirement in Section 9 of Article I of the Constitution that all trials shall take place in the parish in which the offense was committed, unless the venue be changed. We find it unnecessary to consider the question of constitutionality of Act No. 123 of 1936, so far as the question of venue or jurisdiction is concerned, because the question whether the venue is in Lincoln parish or in some other parish does not depend upon the validity or effect of the approval given by the attorney general, or acting attorney general, or upon the constitutionality of Act No. 123 of 1936. We shall decide the question of venue as if the attorney general or acting attorney general had never given his approval of the prosecution in Lincoln parish, and as if the statute providing for his approval had never been enacted. We are not concerned with the effect which the amendment of the indictment, by charging a conspiracy, may have upon the admissibility of evidence, if we conclude that the crime charged in the indictment was committed in Lincoln Parish.

As soon as the amendment of the indictment was allowed, and the defendants had reserved their bills of exception, they filed their pleas to the jurisdiction of the court, and motions to quash the indictment, on the ground that, if a crime was committed as alleged in the indictment, it was not committed in Lincoln parish. The right of a defendant in a criminal prosecution to have the question of venue decided before he is compelled to go to trial is recognized in State v. Moore, 140 La. 281, 72 So. 965, and in State v. Hogan, 157 La. 287, 102 So. 403. Accordingly, the pleas to the jurisdiction, or motions to quash the indictment for want of jurisdiction on the part of the grand jury of Lincoln parish, were assigned for trial, to be had on a date twenty days subsequent to the filing of the pleas. When the pleas came on for trial, but before the trial commenced, the district attorney filed another motion to amend the indictment. The proposed amendment was objected to, on the ground that it would so change the indictment as to charge another crime, entirely different from the crime theretofore charged in the indictment. The judge reserved his ruling on the objection, but afterwards allowed the amendment; to which the defendants reserved bills of exception.

The pleas to the jurisdiction being called up for trial, counsel for one of the defendants, Richard W. Leche, announced that he would submit his plea, and his motion to quash the indictment for want of jurisdiction, without offering any evidence and without argument; and Leche and his counsel then, with leave of court, left the court room, and were absent during all of the trial of the pleas to the jurisdiction. After hearing the evidence the judge overruled the pleas; and in his ruling he declared that the defendant, Leche, had abandoned his plea to the jurisdiction and mo-

tion to quash the indictment for want of jurisdiction. Leche is not complaining in this court, or joining in any of the petitions in which the other defendants are invoking the supervisory jurisdiction of the court. They have filed separate petitions for writs of certiorari and prohibition; that is to say, Monte E. Hart is the relator or complainant in this proceeding, entitled State of Louisiana v. Monte E. Hart et al., In re Monte E. Hart, etc., No. 35,625 of the docket of this court; Leon C. Weiss is the relator or complainant in the proceeding entitled State of Louisiana v. Leon C. Weiss et al., 196 So. 70; and F. Julius Dreyfous and Solis Seiferth are the relators or complainants in the proceeding entitled State v. Weiss et al., 196 So. 69.

The theory on which the defendants base their plea to the jurisdiction is that the venue in a prosecution for obtaining money or property by a fraudulent means or device commonly called a confidence game is in the parish where the money or property was obtained, no matter where the fraud in other respects was perpetrated. It is pointed out that the crime is analogous to the crime of obtaining money or property by false pretenses. 25 C.J. 659, sec. 102. This court has decided twice that the venue in a prosecution for obtaining money by false pretenses is in the parish in which the money was obtained, no matter where the false pretense was made. State v. Simone, 149 La. 287, 88 So. 823; State v. Roy, 155 La. 238, 99 So. 205. These decisions were cited with approval in State v. Matheny, 194 La. 198, 193 So. 587, where the same rule was applied to

the crime of being a deadhead on a public payroll and receiving pay for services not actually rendered,—the venue in such a case being in the parish in which the unearned payment was received.

Inasmuch as the indictment was properly amended before the pleas of prescription or motions to quash were heard, it is not necessary to decide whether the allegations of the indictment,—as it was drawn originally and before it was amended,—would have been sufficient to fix the venue of the alleged crime in Lincoln parish. The amendments—particularly the second amendment—merely amplified the allegations as originally made, and disclosed more plainly that if the crime charged in the indictment was committed at all it was committed in Lincoln parish. For that purpose and for that reason the judge was right in allowing the amendments to be made.

As originally drawn the indictment charged that the defendants obtained, by the alleged fraudulent transaction, "the sum of Twenty-seven thousand ($27,000-.00) Dollars in the lawful money of the United States of America." By the second amendment of the indictment there was added: "and property of the value of twenty-seven thousand ($27,000) dollars, described as follows, to-wit:" Then follows a description of the cashier's checks representing the first three payments that were made to Caldwell Bros. & Hart under the contract, the checks being New Orleans exchange, drawn by the First National Bank of Ruston, Louisiana, on the National Bank of Commerce,

in New Orleans, payable to Caldwell Bros. & Hart, the first being for $163,951.50, dated September 30, 1936, the second being for $43,634.20, dated October 26, 1936, and the third being for $31,808, dated December 10, 1936. These three checks, or New Orleans exchange, amounting to $239,393.70, were received by a representative of the firm of Caldwell Bros. & Hart, in Lincoln parish, in exchange for three checks, of the same amounts and dates, respectively, drawn by Louisiana Polytechnic Institute on the First National Bank of Ruston, in Lincoln parish, and made payable to Caldwell Bros. & Hart. The checks represented the first three payments on the contract price of the building, which price, according to the charge made in the indictment, had been raised by the defendants from $264,482.13 to $291,482.13, by adding fraudulently the sum of $27,000. The first three checks, or New Orleans exchange, amounting to $239,393.70, therefore, represented the same proportion of the $27,000, alleged to have been obtained fraudulently, which the $239,393.70 bears to the total payment of $291,482.13. The first check, amounting to $163,951.50, drawn by the First National Bank in Lincoln parish, on the National Bank of Commerce, in New Orleans, was deposited by the payee, Caldwell Bros. & Hart, to the credit of the firm's account in the American Bank & Trust Company, in New Orleans, and was promptly honored by the National Bank of Commerce. The second check, amounting to $43,634.20, and the third check, amounting to $31,808, drawn by the First National Bank in Rus-

ton on the National Bank of Commerce, in New Orleans, were deposited by the payee, Caldwell Bros. & Hart, to the credit of the firm's account in the Bank of Erath, in Vermilion parish; and these checks also were paid promptly by the National Bank of Commerce in New Orleans, as shown by the endorsements and perforations described in the bill of indictment.

It is argued for the defendants that the allegation made in the amendment of the indictment that the defendants obtained fraudulently three bank checks, or New Orleans exchange, amounting to $239,393.70, is not consistent with the original allegation that the defendants obtained fraudulently the sum of $27,000 "in the lawful money of the United States of America." But, when we consider the explanation made in the indictment as originally drawn, that the $27,000 fraudulently obtained by the defendants was the difference between the contract price of $264,482.13 and the fraudulently-raised price of $291,482.13,— and that the latter sum was received by the defendants in seven payments, on seven different dates,—the allegations made in the amendment of the indictment are not at all inconsistent with the original allegations. The phrase "in the lawful money of the United States of America", in an indictment charging the crime of fraudulently obtaining a certain sum of money, does not mean necessarily that the money was obtained in the form of currency or coin, or both currency and coin. The phrase means merely that the amount which was fraudulently obtained

represented that amount of real money of the United States of America, and not any other kind of money, or the money of a foreign country.

In support of the contention that the second amendment of the indictment charged another crime, different from the crime charged originally in the indictment, counsel for the defendants cite the decision in State v. Sylistan, 169 La. 699, 125 So. 859, and the decision in State v. Dent, 189 La. 159, 179 So. 67. These decisions are not at all appropriate. In Sylistan's case the indictment was for the crime of forging and uttering as true an order for $6. After the jury was impaneled and sworn the district attorney was unable to find the forged instrument; and so, having another order, for $4, which also the defendant was supposed to have forged, the district attorney, over the defendant's protest, amended the indictment by changing the figure from $6 to $4. The defendant, therefore, having been indicted for forging the order for $6, was convicted of forging the other order, for $4. This court stressed the fact that the amendment did not have the effect—and was not intended to have the effect—of merely correcting the amount of the order alleged to have been forged, but was intended to have the effect—and did have the effect—of convicting the defendant of forging an order for the forging of which he was not indicted. In Dent's case, the indictment was for the crime of assaulting with a dangerous weapon with intent to commit murder, and it was held that the district attorney could not amend the indictment so as to charge the crime of striking with a dangerous weapon with intent to commit murder. The court stated as its reason for the ruling that the two crimes were denounced by different statutes and were subject to different penalties. That is not the case here. The crime of "obtaining or attempting to obtain any money or property" by the confidence game is one and the same crime whether the thing obtained be "money or property", and is denounced by one and the same statute, Act No. 43 of 1912, in the same sentence, and as one crime. There is therefore no force in the argument that the amendment of the indictment in this case had the effect of charging another crime, different from the crime charged originally in the indictment.

It is argued for the defendants that, even if they were guilty of the fraudulent transactions described in the indictment, with regard to the raising of the contract price $27,000, they did not commit any crime by receiving the first three checks, or New Orleans exchange, amounting to $239,393.70, because they were entitled to receive $264,482.13. Hence it is argued that the defendants could not have been guilty of obtaining any part of the unearned $27,000 until they had obtained the sum of $264,482.13, which they were entitled to. We doubt that the argument would be sound even if it were not contradicted by a stipulation in the contract, as to how the payments were to be made. But it was stipulated in the contract that the $291,482.13 should be paid only upon certificates of the architects; that the pay-

ments should be made monthly "upon the percentage of work completed"; and that 10 per cent of each monthly payment should be withheld and constitute the final payment, to be made 45 days after completion and acceptance of the work. Therefore, every time Caldwell Bros. & Hart received a monthly payment on the basis of "the percentage of work completed" they received the same percentage of the unearned $27,000 as of the contract price of $264,482.13. The 10 per cent reserved for the last payment represented 10 per cent of the unearned $27,000, plus 10 per cent of the contract price of $264,482.13; and the 90 per cent of the $291,482.13, which 90 per cent was paid out to Caldwell Bros. & Hart in monthly installments as the work progressed, represented 90 per cent of the unearned $27,000, plus 90 per cent of the contract price of $264,482.13. There is, therefore, no sound basis for the argument that Caldwell Bros. & Hart did not receive any part of the unearned $27,000 until they had received all of the contract price of $264,482.13.

■ To argue that the obtaining, in Lincoln parish, of the three checks, or New Orleans exchange, which were as good as the Bank of England for $163,951.50, and for which the payee promptly received that sum in New Orleans, was not the obtaining of "any money or property" in Lincoln parish, would be the same as to argue that the crime of obtaining "any money or property" by means of a confidence game cannot be committed by obtaining fraudulently and by that means a negotiable bank check, payable to the party obtaining it,

and afterwards appropriated to his use and benefit. Our opinion is that the statute is applicable as well to such a case as to a case where money is obtained fraudulently in the form of currency or coin, or where any other valuable property is obtained fraudulently. In that respect this case is unlike the case of State v. Simone, 149 La. 287, 88 So. 823, where the accusation and the admission was that the defendant obtained "money" by false pretenses; and in that respect this case is unlike the case of State v. Roy, 155 La. 238, 99 So. 205, where a cashier's check, or New Orleans exchange, representing a part of the money that was obtained by false pretenses, was sent from Rapides parish to the defendant in Red River parish, and was received and cashed by him in Red River parish,—and where the balance of the money obtained by false pretenses was represented by sight drafts drawn and cashed by the defendant in Red River parish,—and it was held that the district court in Rapides parish did not have jurisdiction over the prosecution for obtaining the money by false pretenses. In that case nothing whatever was done by the defendant in Rapides parish, and no money or thing of value was received by him in Rapides parish.

■ The evidence in this case shows— and it is admitted—that the first cashier's check, or New Orleans exchange, delivered to the representative of Caldwell Bros. & Hart, in Lincoln parish, for $163,951.50, covered the first three certificates of the architects; certificate No. 1 being for $40,825.50, dated July 8, 1936; certificate

No. 2 being for $76,060, dated August 15, 1936; and certificate No. 3 being for $47,066, dated September 8, 1936. Certificate No. 4 for $43,634.20, dated October 13, 1936, and certificate No. 5, for $31,808, dated November 11, 1936, were disposed of in the same way. Certificate No. 6, for $21,224.80, dated December 9, 1936, was paid for by a check drawn by the State Treasurer in Baton Rouge, on the American Bank & Trust Company in New Orleans, payable direct to Caldwell Bros. & Hart, and sent by the State Auditor in a letter dated December 30, 1936, to Louisiana Polytechnic Institute, in Lincoln parish, where the check was delivered by the institute to Caldwell Bros. & Hart. At the same time, in order to have a book-keeping entry of the fact that the payment was made by Louisiana Polytechnic Institute, the institute drew its own check for the same amount, on the First National Bank of Ruston, and deposited the proceeds of the check to the credit of its account in the First National Bank of Ruston. The payments which we have enumerated amounted to $260,618.50; which left a balance of $30,863.63 to complete the payment of $291,482.13. But there was added to this balance of $30,863.63 the sum of $43,955.08 for extras; hence the architects' last certificate, being certificate No. 7, dated May 7, 1937, was issued for $74,818.71, thus making the total cost of the building $335,437.21. But there was an over-payment of $5,000 to Caldwell Bros. & Hart; hence in fact they received $340,437.21 under the contract, including the $43,955.08 for extras. The last three payments, amounting to $79,818.71, and con-

sisting of the balance of $30,863.63 due under the contract for $291,482.13, the extras amounting to $43,955.08, and the over-payment of $5,000, were made by three checks drawn by Louisiana Polytechnic Institute on the First National Bank of Ruston, and made payable to Caldwell Bros. & Hart,—the first check being for $18,870.36, dated June 2, 1937, the second check being for $35,948.35, dated March 17, 1938, and the third check being for $25,000.00, dated July 7, 1938. The record does not show whether these checks were delivered to Caldwell Bros. & Hart in Lincoln parish, or were mailed to the firm, either in New Orleans or in Erath, in Vermilion parish. But the cancelled checks and the testimony on the subject show that the checks were deposited by Caldwell Bros. & Hart to their credit in their checking account in the Bank of Erath, and were promptly and in due course collected by the Bank of Erath from the First National Bank in Ruston. It is argued that all of the $27,000, alleged to have been obtained fraudulently, was included in these last three payments, amounting to $79,818.71, because the previous payments, amounting to $260,618.50, did not amount to the sum of $264,482.13 which the firm of Caldwell Bros. & Hart would have been entitled to under the contract, even if the price had not been raised $27,000. The contract itself, however, and the architects' certificates, and the testimony on the subject, show that the unearned $27,000 was not all included in the last three payments amounting to $79,818.71. Besides, the proportion of the $27,000 that was included in the last three pay-

ments of $79,818.71, made after the building was completed, was not obtained by Caldwell Bros. & Hart from Louisiana Polytechnic Institute in Erath, in Vermilion parish. The amount was obtained by Caldwell Bros. & Hart from the Bank of Erath in Vermilion parish; but the crime was not committed, or completed, as far as that portion of the $27,000 was concerned, until the Bank of Erath, as the agent and for the benefit of Caldwell Bros. & Hart, obtained the amount from the First National Bank of Ruston, where the amount was charged against the checking account of Louisiana Polytechnic Institute. In that connection, the district attorney introduced in evidence the three deposit slips, or receipts, which the Bank of Erath gave to Caldwell Bros. & Hart when the firm deposited the three checks, respectively, to the credit of the firm's checking account in the bank. On each of these deposit slips, or receipts, is printed the usual declaration that, in receiving items for deposit or collection, the bank acts only as the depositor's collecting agent, and assumes no responsibility beyond the exercise of due care, and that all items are credited subject to final payment in cash or solvent credits. The sending of the checks, therefore, by the Bank of Erath, to the First National Bank of Ruston for payment by that bank, was, virtually, the act of Caldwell Bros. & Hart, and was done for their account and benefit. The fact that the Bank of Erath immediately credited the amount of the checks to the checking account of Caldwell Bros. & Hart, and that they had the right to draw against the deposit immediately, is not a controlling

factor in determining whether Caldwell Bros. & Hart obtained the amount of the checks from Louisiana Polytechnic Institute in Ruston or Erath. The defendants cite decisions having reference to the statute, Act No. 63 of 1926, which declares that one who places a check or draft in a bank for collection and remittance or delivery of the proceeds, as agent, and not for deposit, has a lien on all of the assets of the bank, for the amount of the check or draft, if the bank collects the amount and fails to remit or deliver it to the owner. In the cases cited, it was held, of course, that, if in fact the check or draft was placed in the bank for deposit, and not merely for collection by the bank and remittance or delivery of the proceeds to the owner of the check or draft as his agent, the printed statement to the contrary on the deposit slip or receipt given for the check or draft could not be invoked successfully by the depositor to contradict the true facts, and thereby to give him an undue preference over the other creditors of the bank. But that doctrine should not have application to a case where the object or purpose of the depositor, in undertaking to contradict the stipulation on the deposit slip or receipt, is to make it appear that the bank acted only for its own account and benefit, and not at the instance or for the benefit of the depositor, in the consummation of a fraudulent transaction on his part and for his benefit.

It is possible that the court might hold,— if it were necessary to decide the question,—that this prosecution might have

been brought in Vermilion parish, under the provision in Section 988 of the Revised Statutes of 1870, that, "When any crime or misdemeanor shall * * * be begun in one parish and completed in another, it may be dealt with, inquired of, tried, determined and punished in either of the parishes in the same manner as if it had been actually and wholly committed therein." That statute, which was enacted originally as Section 12 of Act No. 121 of 1855, was declared unconstitutional, in the case of State v. Montgomery, 115 La. 155, 38 So. 949, but only in so far as the statute undertook to allow a prosecution to be had in a parish other than that in which the crime was committed, provided it was committed within 100 yards from the boundary line of the parish in which the prosecution is had. That constitutional objection has been removed by a provision in Section 9 of Article I of the Constitution of 1921, allowing a prosecution to be had in either parish where the crime was committed within 100 yards from a boundary line between two parishes. But we are not aware of any constitutional objection to the provision in Section 988 of the Revised Statutes, with reference to a crime that was begun in one parish and completed in another. The only question, however, that we are called upon now to decide is whether the district court in Lincoln parish has jurisdiction over this case; and, for the reasons which we have stated, our conclusion is that the district court in that parish has jurisdiction.

The State will have to prove beyond a reasonable doubt, on the trial of this case, not only that the crime charged in the indictment was committed by the defendants, if in fact it was committed by them, but also, as a matter of fact, that the crime was committed in Lincoln parish. The defendants' availing themselves of their right to test the question of jurisdiction or venue, before being put on trial, does not deprive them of their right to have the question of venue decided finally by the jury. If there is anything anomalous in that it is because the wording of the Constitution, Section 9 of Article I, requires that the trial—and not merely the conviction—shall take place in the parish in which the offense was committed.

The relief prayed for by the relator in this case is denied, and the judgment of the district court, overruling the relator's plea to the jurisdiction of the court, is affirmed.

HIGGINS, J., concurs in the decree.